UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LINDA GIBBS,

     Plaintiff,

v.

VOITH INDUSTRIAL
SERVICES, INC. and
RALPH ILARDI,

     Defendants.

Case No. 13-cv-13476
Honorable Laurie J. Michelson

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [13]**

---

Plaintiff Linda Gibbs alleges that her former employer, Defendant Voith Industrial Services, and former supervisor, Defendant Ralph Ilardi, violated state and federal law by changing her work assignment, denying her training, and otherwise harassing her after she returned to her janitorial position from double knee surgery. She claims that Defendants discriminated against her based on her age and gender, created a hostile work environment, and retaliated against her in violation of the Elliott-Larsen Civil Rights Act, Michigan Compiled Laws §§ 37.2101 *et seq.*, and retaliated against her for taking medical leave in violation of the Family and Medical Leave Act, 29 U.S.C. § 2611. She also alleges that Defendant Ilardi committed torts against her. This matter is before the Court on Defendants' motion for summary judgment on all counts. (Dkt. 13.)

Gibbs uses her narrative of the months following her knee surgeries to support a number of employment-discrimination claims. The Court finds that only two, the age-discrimination and the FMLA-retaliation claims, present genuine issues of material fact. The others fail either

because Gibbs has not tied allegedly adverse actions to her age or gender, or because Gibbs has not presented evidence of a materially adverse action at all. And Ilardi's actions towards Gibbs simply do not rise to the level of intentional infliction of emotional distress, assault, or battery under Michigan law. Therefore, the Court GRANTS IN PART and DENIES IN PART Defendants' motion for summary judgment.

## I.   FACTUAL BACKGROUND

The following facts are undisputed for the purpose of Defendants' motion unless otherwise noted.

Plaintiff Linda Gibbs is a former janitorial employee of Defendant Voith Industrial Services ("Voith"). She was over fifty years old when hired by Voith in November 2008 (Dkt. 13-4, Deposition of Linda Gibbs, at 11 [hereinafter "Gibbs Dep."].) She worked under the supervision of Defendant Ralph Ilardi, who was also over fifty. (*Id.* at 18.) Her job responsibilities included dusting and vacuuming offices, mopping and waxing floors, sanitizing restrooms, and maintaining the sidewalk at a Ford Motor Company office and storage facility. (*Id.* at 27–29.)

Gibbs slipped and injured her left knee while changing a water dispenser on the job on October 22, 2011. (*Id.* at 20, 27.) She was the "first person to get injured" at her plant in some time. (*Id.* at 79.) Per Voith's internal policies, Ilardi directed her to an independent clinic, Concentra, whose physicians issued work restrictions consisting of "[n]o walking long distances [and] no standing for long periods of time." (*Id.* at 23.) The day she returned from the clinic, Ilardi told her to do her regular job for the rest of the day. (*Id.* at 24.) Ilardi also commented that people over fifty "take longer to heal" and that Gibbs should be exercising to help speed the recovery process. (*Id.* at 18.) The next day, Ilardi accommodated her Concentra restrictions by

assigning her to office filing work and shampooing furniture and carpets with a "home type" device (meaning a smaller device with a smaller water tank). (*Id.* at 34–35.) But Gibbs did not feel that the shampooing was an appropriate accommodation because her knee was still swollen. (*Id.* at 37.) She also objected to having to carry jugs of water to refill the shampoo device as she worked. (*Id.*)

Gibbs attended ten sessions of physical therapy at Concentra as required by Voith's policies and then elected to see her regular doctor. (*Id.* at 38.) During the intervening week, Ilardi assigned Gibbs to her regular job because her restrictions from Concentra had expired. (*Id.* at 40.) Her own doctor ordered knee surgery and while she was on leave preparing for the surgery, Gibbs injured her other knee. (*Id.* at 22–24.)

In the meantime, Ilardi miscalculated Gibbs' total amount of leave and, in April 2012, mistakenly informed her that she had been terminated and her insurance cancelled under Voith's leave policies. (Dkt 13-6, Deposition of Ralph Ilardi, at 37 [hereinafter "Ilardi Dep."].) Because her insurance was due to lapse on April 30, Gibbs had her knee surgeries earlier than she had planned. (Gibbs Dep. at 56.) She was without insurance coverage from April 30 to May 23, 2012, the day she would ultimately return to work. (*Id.*) As a result, she was unable to undergo physical therapy for her second knee during this time. (*Id.* at 57.) At some point, Ilardi's mistake was discovered and corrected by a union representative and Gibbs was told she had not, in fact, been terminated and that her insurance would be reinstated upon her return to work. (*Id.* at 64.)

Gibbs did not have any restrictions when she returned to work on May 23. Because of her knee issues, however, Ilardi gave her a "light duty" assignment to sweep an annexed area of the facility ("the Annex") along with another employee. (Ilardi Dep. at 38; Dkt. 13-2, Ilardi Decl. at ¶ 7.) Gibbs was assigned to the Annex full-time. (Gibbs Dep. at 94.) Gibbs, her union

representative, and a former co-worker say that the Annex was considered to be a punishment assignment among Voith workers. (*See* Gibbs Dep. at 95; Dkt. 14-3, Fisher Aff., at ¶ 7–8; Dkt 14-4, Perry Aff., at ¶ 13.) The former co-worker, Jan Fisher, avers that she was assigned to the Annex "as [her] punishment" after returning from shoulder injury. (Fisher Aff. at ¶ 9.) The Annex is approximately 20,000 square feet without any windows or fans, and the lights are motion-activated. (Gibbs Dep. at 65). This large area was known to contain rats, bats, pigeons, ducks, and raccoons. (*Id.* at 95.) While in the Annex, Gibbs had to deal with and clean up after these unwelcome inhabitants; indeed, at one point she was chased down an aisle by a rat. (*Id.* at 95.)

Three weeks after Gibbs' return to work, Voith also asked her to complete a fitness for duty examination pursuant to its FMLA policies. (*Id.* at 76; Gibbs Dep. Ex. 6 at 24.) She was required to wear a heart monitor during the exam, a requirement she did not understand. (Gibbs Dep. at 76.) But she did pass the exam. (*Id.* at 76.) Gibbs says that she was aware of at least one other Voith janitorial employee at a different Ford facility who was not required to complete a fitness for duty examination after a knee replacement surgery. (*Id.* at 9.) After the exam, Ilardi approached Gibbs as she was cleaning a women's restroom and asked her to sign some papers, which she did not want to do before speaking with her union representative. (*Id.* at 79.) In response, Ilardi called her a "bitch." (*Id.* at 101.)

Throughout this time and during the time period before her injuries, Gibbs says she was denied training for personal burden carriers (vehicles similar to golf carts). A license to operate these vehicles would have allowed her to perform her duties with "less walking and standing" and made her eligible for more overtime. (Dkt. 14, Pl.'s Resp. Br. at 10; Gibbs Dep. at 183.) Ilardi had the authority to administer or deny training for these vehicles. (Dkt. 14-6, Deposition

4

of Paul Antioch [hereinafter "Antioch Dep."] at 22.) Gibbs testified that in October 2011 she was not given a license to operate this equipment until the day that the license was set to expire, and that Ilardi refused to let her train on the equipment after that point. (Gibbs Dep. at 184.) When she asked to be trained, Ilardi responded that he did not want her to drive. (*Id.* at 87.) But Gibbs' former coworker averred that Ilardi had commented that Gibbs was "too old to be trained." (Fisher Aff., at ¶ 3.) Gibbs testified that while she was able to get some overtime hours due to a special arrangement with her union, there were three to four instances where she wanted weekend overtime but was denied due to her inability to operate the burden carrier. (Gibbs Dep. at 89.)

Gibbs eventually filed a union grievance against Ilardi on July 12, 2012. (*Id.* at 70; Gibbs Dep. Ex. 17.) The grievance read as follows:

> Employee Linda Gibbs feels she is being harassed by manager Ralph Ilardi by intimidation where he is alone with her and on occasions in front of other employees. She feels he's trying to force her to quit her job.

(Gibbs Dep. Ex. 17.) The grievance did not contain any specific information about the harassment. (*See id.*)

The company denied the grievance and ultimately the union declined to pursue the grievance to completion. (*Id.*) Gibbs alleges that Ilardi's supervisor Paul Antioch prematurely ended the process and threatened her with discipline if she filed another grievance. (Gibbs Dep. at 121.) Antioch testified that he did have some sort of personal friendship with Ilardi through an intramural hockey league but that he did not remember anything about Gibbs' grievance. (Antioch Dep. at 31–32, 35.) Gibbs also spoke with a Human Resources representative and said that the representative spoke with Ilardi, but that the conversation only resulted in more harassment from Ilardi. (Gibbs Dep. at 73.) Defendants deny both of these allegations and

maintain that the grievances did not move forward because they had no merit. (Defs.' Br. at 7 (citing Gibbs Dep. at 71).)

The final incident occurred on August 17, 2012, when Ilardi gave Gibbs a new mesh safety vest (about the size and weight of a t-shirt) while she was in the lunchroom with nine co-workers. (Gibbs Dep. at 13–14.) Defendants characterize this act as a "toss" (Defs.' Br. at 6); Gibbs characterizes it as a "throw" (Pl.'s Resp. Br. at 12). The mesh vest did not physically injure Gibbs but she testified that she felt embarrassed and emotionally hurt by Ilardi's actions. (Gibbs Dep. at 16.)

Gibbs resigned on August 20, 2012. (*Id.* at 16.)

## II.  PROCEDURAL HISTORY

Gibbs filed a complaint against Voith and Ilardi in Wayne County Circuit Court on July 16, 2013. (Dkt. 1.) She asserted claims of Age and Gender Discrimination under the Michigan Elliott-Larsen Civil Rights Act ("ELCRA") (Count I); Hostile Work Environment under ELCRA (Count II); Retaliation under ELCRA (Count III); Retaliation under the Family and Medical Leave Act ["FMLA"] (Count IV); Intentional Infliction of Emotional Distress ("Count VI"); and Assault, Battery, and/or Assault and Battery ("Count VII"). (*See* Dkt. 1.) Defendants removed the case to this Court based on the FMLA claim on August 14, 2013. (Dkt. 1.) Defendants moved for summary judgment on all counts on May 16, 2014. (Dkt. 13.) The motion is fully briefed (Dkts. 14, 15) and the Court heard oral argument on September 9, 2014.

## III. STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the

governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). On a motion for summary judgment, the court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Eward*, 241 F.3d 530, 531 (6th Cir. 2001).

The moving party may discharge its initial summary judgment burden by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party does so, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. The Court must determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to a jury, or whether the evidence is so one-sided that the moving party must prevail as a matter of law. *Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

## IV. ANALYSIS

Gibbs outlines a lengthy series of allegedly adverse actions and attempts to tie each one to all six counts in the Complaint. While the Court agrees that Ilardi's denial of training on the personal burden carrier supports a claim of ELCRA age discrimination and that Gibbs' reassignment to the Annex supports a claim of FMLA retaliation, the Court finds that the other claims do not survive summary judgment for various reasons that will be outlined in detail below.

**A. Count I – Age and Gender Discrimination under the Michigan Elliott-Larsen Civil Rights Act**

In Count I, Gibbs alleges that Defendants subjected her to discrimination based on her age and gender in violation of the Michigan Elliott-Larsen Civil Rights Act. These claims "may be established by either proffering direct evidence of discrimination, or relying on circumstantial evidence to create an inference of discrimination." *Jacklyn v. Schering-Plough Healthcare Products Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999) (interpreting Michigan law); *see Harrison v. Olde Fin. Corp.*, 572 N.W.2d 679, 681 (Mich. 1997) ("In analyzing discrimination claims arising under the Michigan Civil Rights Act, Michigan courts have often resorted to federal precedent for guidance.").

If Gibbs relies on direct evidence, she must present "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Id.* at 926. "Put differently, [d]irect evidence is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption." *Lundy v. Thyssen Krupp Steel NA, Inc.*, No. 294611, 2011 WL 149985, at *4 (Mich. Ct. App. Jan. 18, 2011) (quoting *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir. 2003)). And once such evidence is presented, "the burden of persuasion shifts to the defendant to show that it would have [taken the disputed action] had it not been motivated by discrimination." *Jacklyn*, 176 F.3d at 926. In other words, "a defendant may avoid a finding of liability by proving that it would have made the same decision even if the impermissible consideration had not played a role in the decision." *Sniecinski v. Blue Cross & Blue Shield of Mich.*, 666 N.W.2d 186, 193 (Mich. 2003).

If Gibbs relies on indirect evidence, "the federal burden of proof analysis and construct established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed.2d

668 (1973) applies." *Harrison*, 572 N.W.2d at 681. This approach "allows a plaintiff to present a rebuttable prima facie case on the basis of proofs from which a factfinder could *infer* that the plaintiff was the victim of unlawful discrimination." *Sniecinski*, 666 N.W.2d at 193 (citation omitted). To meet her initial burden under this standard, she must show that "(1) she is a member of a protected class, (2) she was subjected to an adverse employment action, (3) she was qualified, and (4) she was treated differently than similarly-situated [male or younger] employees for the same or similar conduct." *Jacklyn*, 176 F.3d at 928. This initial burden has been characterized as "relatively light." *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 473 (6th Cir. 2002). If she succeeds, the burden will then shift to Defendants to proffer a non-discriminatory reason for the action. *McDonnell*, 411 U.S. at 802. Gibbs would then have the burden of showing that the proffered reason was a pretext for discriminatory conduct. *Harrison*, 572 N.W.2d at 608.

"Under either the direct evidence test or the *McDonnell-Douglas* test, a plaintiff must establish a causal link between the discriminatory animus and the adverse employment decision." *Sniecinski*, 666 N.W.2d at 193. In the *McDonnell-Douglas* context, a successful prima facie case "raises an inference of discrimination only because [the court] presume[s] these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). By contrast, when using the direct evidence test, "a plaintiff must present direct proof that the discriminatory animus was causally related to the adverse employment decision." *Snieckinski*, 666 N.W.2d at 193.

### 1. Age Discrimination

In support of her age-discrimination claim, Gibbs alleges that Defendants allowed younger workers to train on the personal burden carriers and did not require younger workers to

wear heart monitors during return-to-work physicals. (Compl. ¶ 45(a).) She also points to Ilardi's comments that people "over 50" took "longer to heal" and that she was "too old to be trained" on the machinery. (*Id.*)

Defendants urge that Gibbs' age-discrimination claim fails because Gibbs "suffered no adverse action with regard to training or overtime." (Defs.' Reply Br. at 1.) Defendants are correct that "[i]n order to establish a prima facie case of age discrimination using either direct or circumstantial evidence, a plaintiff must show that he was subjected to an adverse employment action." *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 181 (6th Cir. 2004). Moreover, "denial of training opportunities is only an adverse employment action if it had a tangible impact on [plaintiff's] growth, advancement, or compensation." *Minevich v. Spectrum Health-Meier Heart Center*, 1 F. Supp. 3d 790 (W.D. Mich. 2014); *see also Johnson-Romaker v. Kroger Ltd. Partnership One*, 609 F. Supp. 2d 719, 725 (N.D. Ohio 2009). Gibbs argues that a license to operate the burden carrier would have allowed her more overtime hours on the weekends. (Pl.'s Resp. Br. at 10.) Defendants respond that Gibbs was able to work overtime regardless, due to a special arrangement with her union representative. (Defs.' Reply Br. at 2 (citing Gibbs Dep. at 89).)

The Sixth Circuit has recognized that "allegations of a denial of overtime, properly supported, could constitute an adverse employment action." *Broska v. Henderson*, 70 F. App'x 262, 268 (6th Cir. 2003). But plaintiffs proceeding on this theory must demonstrate that they have "been denied overtime opportunities that others have received" and show "how much overtime [they] lost . . . ." *Id.* Gibbs' testimony regarding the three or four times she was unable to work overtime on the weekends is somewhat vague, and she has not proffered evidence that other employees were able to work more overtime than she was through her arrangement with

10

her union. But her burden on summary judgment is only to show that there is a genuine issue of material fact for trial. Because there is some testimony in the record showing that Gibbs missed out on three to four overtime opportunities, the Court will proceed with its analysis of the prima facie case. *Cf. Flynn v. Oakland Cty.*, 2009 WL 2046133, at *9 (E.D. Mich. July 9, 2009) (rejecting denial-of-overtime claim where "the record contains no evidence that Flynn was denied overtime opportunities. Flynn dedicates one sentence to this claim in his brief and entirely fails to offer evidence sufficient to meet his burden on summary judgment.").

A prima facie case of discrimination also requires direct or indirect evidence that establishes a causal link between the adverse employment action and discriminatory animus. The Court first turns to the direct evidence; namely, Ilardi's comments. Courts are to consider several factors to evaluate age-related comments as direct evidence in discrimination claims:

> In age discrimination cases, this court has examined statements allegedly showing employer bias by considering whether the comments were made by a decision maker or by an agent within the scope of his employment; whether they were related to the decision-making process; whether they were more than merely vague, ambiguous, or isolated remarks; and whether they were proximate in time to the act of termination.

*Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1330 (6th Cir. 1994); *see also Hiser v. Grand Ledge Pub. Sch.*, 816 F. Supp. 2d 496, 507 (W.D. Mich. 2011) (applying *Cooley* in an ELCRA age-discrimination claim).

The Court finds that Ilardi's comment regarding healing after age fifty is too ambiguous to constitute direct evidence of age discrimination. Given that Ilardi himself was over fifty years of age at the time (Gibbs Dep. at 18), it is possible that he was merely relating his own experiences about his ability to heal post-injury. *See MacDonald v. United Parcel Serv.*, 430 F. App'x 453, 460 (6th Cir. 2011) ("MacDonald testified that Bowen told him to 'move your old ass' during the contentious events of January 25, 2007, but Bowen is only three years younger

11

than MacDonald, so even viewed in the light most favorable to MacDonald, this statement does little for him."). And the comment was accompanied by Ilardi's advice that exercise would be good for Gibbs' healing. (*Id.* at 37.) In this context, the comment does not require the conclusion that Ilardi harbored discriminatory feelings towards workers over fifty. *Cf. Phelps v. Yale Sec., Inc.*, 986 F.3d 1020, 1025–26 (6th Cir. 1993) (holding that the defendant's comment that the plaintiff's upcoming fifty-fifth birthday was a "cause for concern" was too ambiguous to give rise to an inference of age discrimination and therefore was not direct evidence).

The same does not hold true for the comment that Gibbs was "too old to train." In *DeBrow v. Century 21 Great Lakes, Inc.*, 620 N.W.2d 836, 838 (Mich. 2001), the Michigan Supreme Court considered a claim of age discrimination where the plaintiff presented evidence that, in the course of firing him, his supervisor commented that the plaintiff was "getting too old for this shit." In reversing a grant of summary judgment to the employer, the court concluded:

> Considered in the light most favorable to the plaintiff, this remark could be taken as a literal statement that the plaintiff was "getting too old" for his job and this was a factor in the decision to remove him from his position. While a factfinder might be convinced by other evidence regarding the circumstances of the plaintiff's removal that it was not motivated in any part by the plaintiff's age and that the facially incriminating remark was no more than an expression of sympathy, such weighing of evidence is for the factfinder, not for this Court in reviewing a grant of a motion for summary disposition.

*Id.* at 838.

Similarly here, Ilardi's comment unambiguously ties his denial of training to Gibbs' age. Ilardi was in a position to deny training to Gibbs. (Ilardi Dep. at 21.) And Gibbs testified that she was denied training on an ongoing basis during her employment with Voith. (Gibbs Dep. 86–87.) It is plausible that this comment was made during or shortly after Ilardi made a decision on denying training to Gibbs. Finally, there is no evidence of context that might render the comment

ambiguous. In these circumstances, the comment qualifies as direct evidence of age discrimination and should be evaluated by a jury.

Gibbs also offers indirect evidence of age discrimination in the administration of training. She says that her younger coworker, Jan Fisher, was trained on the burden carriers. (Fisher Aff. at ¶ 2.) Fisher is forty years old, ten years younger than Gibbs. (Fisher Aff. at ¶ 4.) Unlike the federal Age Discrimination in Employment Act, ELCRA "imposes no age forty protected class limitation in ELCRA age discrimination actions, and does not require that an ELCRA plaintiff show replacement by a substantially younger employee. An ELCRA plaintiff need only show replacement by a younger individual." *Winter v. Fitness USA Health Spas Corp. Flint/Lansing*, No. 188648, 1999 WL 33430030, at *2 (Mich. Ct. App. Nov. 12, 1999) (citing *Matras v. Amoco Oil Co.*, 385 N.W.2d 586, 589 (Mich. 1986); *Barnell v. Taubman Co., Inc.*, 512 N.W.2d 13, 19 (Mich. 1993)). Gibbs has met her initial burden to show age discrimination with indirect evidence: she has shown that she was a member of a protected class, she was denied training on the burden carriers, despite apparently being issued a license previously (showing she was qualified to be trained), and a younger employee was given such training.

Gibbs has presented sufficient direct and indirect evidence to establish a prima facie case of age discrimination. Because Defendants put forth no non-discriminatory reason for Ilardi's decision not to train Gibbs, the Court need proceed no further under the burden-shifting framework. Gibbs' age-discrimination claim will survive summary judgment.

### 2. Gender Discrimination

In support of her gender-discrimination claim, Gibbs claims that male employees were not "improperly stripped of promised hourly and mileage compensation for attending company-required medical analysis" and that male employees "were not made to undergo additional

13

medical requirements" like she was. (Compl. at ¶ 45(b).) She also says that Ilardi called her a "bitch." (*Id.*)

As to the "bitch" comment, "[w]hile a single remark from a supervisor in the context of a discussion regarding plaintiff's termination, even if the statement might be subject to multiple interpretations, is sufficient to constitute direct evidence, and the remark's weight and believability are matters for the fact-finder to determine, a stray remark that is outside the context of the termination decision is not necessarily probative of an employer's discriminatory intent." *Wolfgang v. Dixie Cut Stone & Marble, Inc.*, No. 285001, 2010 Mich. App. LEXIS 130, at *2 (Mich. Ct. App. Jan. 21, 2010).

The Court finds that the "bitch" comment does not constitute direct evidence of gender discrimination. Ilardi did not have the authority to fire Gibbs, (Defs.' Br. at 9), and it is unclear whether he had the authority to order Gibbs to undergo the medical testing or had any part in the decision not to reimburse her for mileage. In any event, these actions occurred before he made the comment. Indeed, it does not appear that this comment was made during the course of any sort of decisional process. *See Wolfgang*, 2010 Mich. App. LEXIS 130 at *2 ("LeCronier testified that he was involved in the decision to terminate plaintiff, but he was not the ultimate decision maker in this case. Rather, there were several people involved in the termination decision. Further, none of LeCronier's remarks were made in connection with plaintiff's termination, they appear to be isolated, and they were made at least two months before plaintiff's termination. Therefore, we do not believe that plaintiff presented direct evidence of gender discrimination at trial."); *see also Wilson v. Chipotle Mexican Grill, Inc.*, No. 14-3090, 2014 WL 4627977, at *3 (6th Cir. Sept. 17, 2014) ("This leaves the remark . . . that [plaintiff] was a 'black dyke bitch' . . . By the time of the comment, the predicates for firing Wilson had already taken

place . . . . Because Wilson has identified no other statements of this ilk, this stray remark does not suffice by itself to show the differential treatment required to establish her case."). Gibbs cannot establish gender discrimination via direct evidence based on this isolated or stray comment.[1]

The Court therefore turns to Gibbs' indirect evidence of gender discrimination. Defendants argue that Gibbs cannot demonstrate that any of the actions she identifies were materially-adverse employment actions or that similarly-situated male employees were treated more favorably than she was. And, should Gibbs clear those hurdles, Defendants maintain that there were "legitimate business reasons" for each of the actions alleged by Gibbs. The Court has considered these arguments and finds that Gibbs has not demonstrated that similarly-situated male employees were treated differently than she was with respect to medical testing or mileage reimbursement.

For purposes of establishing a prima facie case,

"similarly situated" employees must be similarly-situated in all respects. Thus, to be deemed "similarly-situated," the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

---

[1] Gibbs urges that the "bitch" comment and the "healing over 50" comments "are only two examples of instances in which Ilardi discriminated against Gibbs because of her gender and age." (Pl.'s Resp. Br. at 14.) But Gibbs fails to identify other examples of alleged gender discrimination in the record. Without support from the record, this allegation does not create a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1)(A); *see also Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 270 (6th Cir. 2009) ("A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party.").

*Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992); *see Heim v. Meadwestvaco Corp.*, No. 265285, 2006 WL 1410857, at *3 (May 23, 2006) (utilizing the *Mitchell* standard in an ELCRA age discrimination case).

Here, Gibbs has presented no evidence that male employees under the supervision of Ilardi at her facility were treated differently than she was. Although she indicated at her deposition that her brother-in-law, a Voith employee at a different Ford facility, was not forced to undergo a back-to-work physical after returning from knee surgery (Gibbs Dep. at 77–78), this is insufficient to meet her prima facie burden under *Mitchell*. The *Mitchell* court cautioned that "[i]t is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of [non-protected] employees, the plaintiff must show that the 'comparables' are similarly situated *in all respects*." 964 F.2d at 582 (citing *Stotts v. Memphis Fire Dep't*, 858 F.2d 289 (6th Cir. 1988)). Gibbs has not presented evidence regarding who supervised her brother-in-law, his usual job duties, or relevant policies that may have been in place at his facility. And Gibbs acknowledged that she did not know of any male employees at her own facility who were treated differently upon a return from medical leave. (Gibbs Dep. 78–79.)

As this finding disposes of Gibbs' indirect gender-discrimination claim, the Court declines to address Defendants' other arguments. Defendants are entitled to summary judgment on Gibbs' gender-discrimination claim.

**B. Count II – Hostile Work Environment under ELCRA**

In Count II, Gibbs claims that the discriminatory conduct alleged in Count I created a hostile work environment, especially given Defendants' "failure to take measures to ensure the discontinuance of the treatment," and that this conduct "ultimately result[ed] in her constructive

discharge." (Compl. ¶¶ 2, 6.) The standard for ELCRA discrimination based on hostile work environment is as follows:

> (1) the employee belonged to a protected group; (2) the employee was subjected to communication or conduct on the basis of the protected status; (3) the employee was subjected to unwelcome conduct or communication on the basis of the protected status; (4) the unwelcome conduct or communication was intended to, or in fact did, interfere substantially with the employee's employment or created an intimidating, hostile, or offensive work environment; and (5) respondeat superior.

*Betts v. Costco Wholesale Corp.*, 558 F.3d 461, 468 (6th Cir. 2009); *see also Quinto v. Cross & Peters Co.*, 547 N.W.2d 314, 319–20 (Mich. 1996). Defendants argue that Plaintiff cannot establish the third and fourth requirements. (*See* Defs.' Br. at 20–21.)

"[W]hether a hostile work environment existed shall be determined by whether a reasonable person, in the totality of circumstances, would have perceived the conduct at issue as substantially interfering with the plaintiff's employment or having the purpose or effect of creating an intimidating, hostile, or offensive employment environment." *Elezovic v. Bennett*, 731 N.W.2d 452, 461 (Mich. Ct. App. 2007) (citation omitted). The Sixth Circuit has commented on the type of evidence that establishes a hostile work environment under ELCRA:

> When the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, a plaintiff can prevail on a hostile-environment claim. However, simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.

*Gold v. FedEx Freight E., Inc. (In re Rodriguez)*, 487 F.3d 1001, 1010 (6th Cir. 2007) (citations and internal quotation marks omitted).

Gibbs says that the facts of *Downey v. Charlevoix*, 576 N.W.2d 712, 716 (Mich. Ct. App. 1998) are similar to her situation. In *Downey*, the plaintiff's decedent was purportedly fired after a physical altercation with a supervisor, but plaintiff alleged that the termination was actually a

result of age and handicap discrimination (plaintiff's decedent suffered from depression and was prescribed Prozac), and sought to prove such discrimination through a hostile-work-environment theory. *Id.* at 714–15. The court considered deposition testimony from other employees stating that managers "used the term 'old guys' all the time," "tried to make it miserable for all the older employees," "would 'pick on' the older workers and give preferential treatment to the younger workers," "made derogatory comments regarding different employees that left [an affiant] with the impression that [one manager] believed that older workers were lazy or 'excess baggage,'" and that the other manager "thought the old guys were lazy." *Id.* at 717. Moreover, both managers made derogatory comments about the decedent's prescription medication. *Id.* The court held that "the ongoing comments and conduct directed toward Downey, *because of his age and handicap*, created an intimidating, hostile, and offensive work environment. The deposition testimony of several employees clearly supports this conclusion." *Id.* (emphasis added).

Ilardi's conduct in this case is far short of the pervasive comments in *Downey*. Indeed, Gibbs points to just two comments Ilardi made: that he called her a "bitch" and that he told her that it "takes longer to heal" after 50. While these comments appear to be tied to age and gender, they simply are not enough to support a prima facie case for hostile work environment. *See Veenman v. Holland Bd. of Pub. Works*, No. 214045, 2000 WL 33521854, at *1 (Mich. Ct. App. Mar. 17, 2000) (acknowledging that "Plaintiff has presented evidence to establish that [defendant] made several comments indicating that she thought plaintiff was too old to work in the warehouse" but adopting the trial court's holding that "[r]elatively isolated instances of non-severe misconduct will not support a hostile work environment claim"); *Brown v. Morton's of Chicago/Detroit, Inc.*, No. 202588, 1999 WL 33451613, at *2 (Mich. Ct. App. Mar. 30, 1999) ("[T]hree isolated comments during plaintiff's approximately seventeen months of employment

18

simply were not so sufficiently severe or pervasive as to alter the conditions of plaintiff's employment and create an offensive, hostile or intimidating work environment.").

Gibbs has not cited case law that would allow her to bootstrap the other alleged misconduct, the reassignment to the Annex, for example, to the two isolated comments by Ilardi in order to meet the standard for hostile work environment based on sex and age. (*See* Pl.'s Resp. Br. at 21 (conclusorily asserting that "Ilardi's mistreatment of Gibbs and the harassment are pervasive enough to constitute a hostile work environment.") And these two isolated comments are not enough to create a hostile work environment. Defendants are entitled to summary judgment on the hostile-work-environment claim.

### C.  Count III – Retaliation under ELCRA

In Count III, Gibbs alleges that when she complained about the discriminatory treatment, the harassment continued and she was "ultimately constructively discharged." (Compl. ¶ 10–12.) "To establish a prima facie case of unlawful retaliation under the Civil Rights Act, a plaintiff must show (1) that he engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." *DeFlaviis v. Lord & Taylor, Inc.*, 566 N.W.2d 661, 663 (Mich. 1997).

The parties are in agreement that the "protected activity" for the purpose of Count III is Gibbs' union grievance, filed July 12, 2012 (Gibbs Dep. Ex. 17). (*See* Defs.' Mot. at 22; Pl.'s Resp. Br. at 23.)[2] In response to Defendants' argument that no adverse actions occurred after the

---

[2] In their reply brief, Defendants hint in passing that Gibbs' grievance does not trigger ELCRA protections because her grievance only mentions general harassment rather than age- or gender-based discrimination. (Defs.' Reply Br. at 6 ("[I]mportantly, the grievance never mentions age or sex.").) Had Defendants articulated this argument as a reason to grant summary judgment on the ELCRA retaliation claim, they might have been successful. *See Booker v.*

grievance was filed, Gibbs says that Ilardi's supervisor, Paul Antioch, "was instrumental in preventing Gibbs' grievance from proceeding" and that she "was threatened [by Antioch] with disciplinary action if she complained again." (Pl.'s Resp. Br. at 23 (citing Gibbs Dep. at 121).) She also cites the ongoing harassment and alleged assault and battery by Ilardi. (*Id.*)

As an initial matter, Gibbs asserts that the harassment by Ilardi was not limited to the time period after she filed the grievance; rather, she argues that Ilardi harassed her throughout the time period relevant to this lawsuit. Without any evidence to differentiate the harassment that occurred after the grievance from the harassment that occurred before it, Gibbs cannot raise an inference of ELCRA retaliation. *Cf. Walcott v. City of Cleveland*, 123 F. App'x 171, 178 (6th Cir. 2005) (applying the Title VII retaliation standard and stating that "Defendants first failed to promote Walcott six months prior to her first EEOC filing; the fact that they did so again four months after that filing (and a third time, a month after her second EEOC filing) is insufficient to raise an inference of a retaliatory animus."). And a single vest-throwing incident is not an adverse employment action for it had no effect on Gibbs' compensation, hours, benefits, or responsibilities. Nor can the vest-throwing incident give rise to a finding of constructive discharge because Gibbs has not produced evidence showing that Ilardi threw the vest with the intention of forcing her to quit. *See Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999) ("To constitute a constructive discharge, the employer must deliberately

---

*Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989) ("An employee may not invoke the protections of the Act [ELCRA] by making a vague charge of discrimination. Otherwise, every adverse employment decision by an employer would be subject to challenge under either state or federal civil rights legislation simply by an employee inserting a charge of discrimination. In our view, such would constitute an intolerable intrusion into the workplace."). But the Court need not address the propriety of granting summary judgment on this ground for the Court agrees with the arguments that were explicitly presented in Defendants' briefing.

create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit.").

The Court is troubled by Gibbs' testimony that Antioch threatened her with discipline if she made any more complaints and will not, as Defendants urge, discount this evidence merely because it came from Gibbs herself. *Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 239 (6th Cir. 2010) (holding that on summary judgment, "[a] court may not disregard evidence merely because it serves the interests of the party introducing it." (citations omitted)). Ultimately, however, these threats never manifested themselves in an adverse employment action: Gibbs quit approximately five weeks after the threats could have been made and at that point, she filed this lawsuit instead of pursuing other grievances. She provides no evidence that she was actually subjected to discipline. She has not shown that the threat of discipline had any material effect on her employment. *See Chen v. Wayne State Univ.*, 771 N.W.2d 820, 839 (2009) ("[T]here must be an objective basis for demonstrating that the employment action is adverse because a plaintiff's subjective impressions are not controlling. Materially adverse employment actions are akin to termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished responsibilities, or other indices that might be unique to a particular situation." (citation and internal quotation marks omitted)). This conclusion also supports a finding that Gibbs was not constructively discharged due to the threats. *See Agnew v. BASF Corp.*, 286 F.3d 307, 310 (6th Cir. 2002) ("An employee who quits a job in apprehension that conditions may deteriorate later is not constructively discharged. Instead, the employee is obliged not to assume the worst, and not to jump to conclusions too fast." (citation and internal quotation marks omitted)).

Defendants are entitled to summary judgment on the ELCRA retaliation claim.

### D.  Count IV – Retaliation in Violation of the Family and Medical Leave Act

The Family and Medical Leave Act ("FMLA") entitles covered employees to take up to twelve weeks of leave per year due to certain personal or medical situations. *See* 29 U.S.C. § 2612(a). Employers may not "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). Section 2615(a)(2) gives rise to the "retaliation or discrimination theory" of FMLA recovery, *Killian v. Yorozu Automotive Tennessee, Inc.*, 454 F.3d 549, 555 (6th Cir. 2006), which is the claim that Gibbs asserts here. (Compl. ¶ 20.)

> To establish a prima facie case of FMLA retaliation, Gibbs must demonstrate that:
>
> (1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

*Donald v. Sybra. Inc.*, 667 F.3d 757, 761 (6th Cir. 2012) (quoting *Killian*, 454 F.3d at 556 (6th Cir. 2006)).

Here, the parties dispute whether Defendants' actions towards Gibbs constituted materially adverse employment actions. (*See* Defs.' Br. at 23; Pl.'s Resp. Br. at 24.) Gibbs points to the return-to-work physical, Ilardi's mistaken notice of termination, Defendants' refusal to train her to use the personal burden carriers, Illardi's comments to her, and her assignment to the Annex as materially adverse actions designed to "get rid" of her after she took FMLA leave.[3] (Pl.'s Resp. Br. at 24; Compl. ¶ 17.) Defendants argue that, as a matter of law, these actions are not materially adverse employment actions. (Defs.' Br. at 23.) The Court finds that there is a

---

[3] It is undisputed that Gibbs first took medical leave as early as 2011. (Defs.' Br. at 2; Pl.'s Resp. Br. at 2–3.)

genuine issue of material fact as to whether the reassignment to the Annex was a materially adverse action.

As in ELCRA claims, courts evaluate adverse action in FMLA-retaliation claims under the Title VII retaliation standard announced in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006). *See Jordon v. City of Cleveland*, 464 F.3d 584, 594 (6th Cir. 2006). This includes the Sixth Circuit. *Crawford v. JP Morgan Chase & Co.*, 531 F. App'x 622, 627 (6th Cir. 2013) ("We join [the Second, Third, Fourth, Fifth, Seventh, and Tenth Circuits] in concluding that *Burlington* applies to retaliation claims under the FMLA."); *see also Murphy v. Ohio State Univ.*, 549 F. App'x 315, 321 (6th Cir. 2013). The adverse action element requires that a plaintiff "show that a reasonable employee would have found the challenged action materially adverse." *Burlington N.*, 548 U.S. at 68. And "[f]or purposes of the FMLA's anti-retaliation provision, a materially adverse action is any action by the employer that is likely to dissuade a reasonable worker in the plaintiff's position from exercising his legal rights." *O'Sullivan v. Siemens Indus., Inc.*, No. 11-11832, 2012 U.S. Dist. LEXIS 136163, at *23 (E.D. Mich. Sept. 24, 2012) (quoting *Millea v. Metro-North R.R.*, 658 F.3d 154, 164 (2d Cir. 2011)).

Gibbs emphasizes that her reassignment to the Annex, "is, in itself, a retaliatory action . . . ." (Pl.'s Resp. Br. at 24.) As Defendants correctly note in their brief, "reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims." *Kocsis v. Multi-Care Mgmt.*, 97 F.3d 876, 885 (6th Cir. 1996) (citation omitted). "A reassignment without salary or work hour changes, however, may be an adverse employment action if it constitutes a demotion evidenced by a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *White v. Burlington N. & Santa Fe Ry.*, 364 F.3d 789,

23

797 (6th Cir. 2004) (en banc) (citing *Kocsis*, 97 F.3d at 885), *aff'd*, *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53 (2006); *see also McMillian v. Potter*, 130 F. App'x 793, 796–797 (6th Cir. 2005) (applying *Kocsis* in a FMLA retaliation case).

Defendants cite *O'Sullivan v. Siemens Indus.*, No. 11-11832, 2012 U.S. Dist. LEXIS 136163, at *22–23 (E.D. Mich. Sept. 24, 2012), for the proposition that Gibbs' reassignment to the Annex is not a materially adverse action as a matter of law. (Defs.' Br. at 23.) In *O'Sullivan*, a fire-suppression-systems sales representative alleged that her employer retaliated against her for taking FMLA leave for the birth of a child by assigning her to a new, allegedly less fruitful sales territory within the state of Michigan. *Id.* at *10–11. The court concluded that this territory reassignment was not an adverse action for purposes of a FMLA-retaliation claim: "There is no proof that the plaintiff's earnings were reduced or that her working conditions would have been more burdensome. The territory to which she would have been reassigned was not 'prime,' but . . . it was capable of allowing the plaintiff to generate income that was roughly the same as what she earned before her leave." *Id.* at *23–24.

*O'Sullivan* is on point to this extent: there is no evidence in this case suggesting that Gibbs experienced a significant change in her hours and job responsibilities or a demotion when she was assigned to the Annex. But that is not Gibbs' theory. She asserts that the reassignment was an adverse action because of the Annex's vermin problem, the isolation, its reputation as a punishment assignment, and the fact that she had to stay on her feet during her shift. (Pl.'s Resp. Br. at 7–8.) That is to say, she contends that the seemingly lateral transfer to the Annex in fact constituted an adverse employment action due to circumstances unique to the Ford facility. *See Burlington N.*, 364 F.3d at 797. *O'Sullivan* is not helpful to Defendants with regard to Gibbs' claim that an undesirable assignment can constitute an adverse action.

24

Still, "a plaintiff's subjective impression concerning the desirability of one position over another does not control with respect to the existence of an adverse employment action." *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 183 (6th Cir. 2004). But that point of law is also not dispositive because Gibbs has presented affidavits from a coworker and her union representative averring that the Annex, with its vermin and isolation, was known as a "punishment assignment" among all Voith employees, not just Gibbs herself. (Fisher Aff. at ¶ 8; Perry Aff. at ¶ 13.) The Court also notes the wide variety of animal pests (and their associated wastes) in the area: pigeons, ducks, aggressive rats, bats, and raccoons, to name a few. Gibbs also points out that being assigned to the Annex full-time, as she was, was "uncommon" – the common practice was apparently to assign workers to the Annex a maximum of one day per week, rather than every day as Gibbs was assigned. (Gibbs Dep. at 67–68.)  Finally, she says that the Annex, unlike her previous routes, did not have any places where she could lean or sit down in order to rest her knees during her shift. (Gibbs Dep. at 68; Perry Aff. at ¶ 12.)

The Court finds that Gibbs has pointed to evidence that raises a question of material fact. Gibbs has presented evidence that her new route was "more arduous and dirtier," *Burlington N.*, 548 U.S. at 71, than her previous one. And courts have denied summary judgment in the face of similar evidence in the past. *See Deleon v. Kalamazoo Cty. Rd. Comm'n*, 739 F.3d 914, 919 (6th Cir. 2014) ("[A]n employee's transfer may constitute a materially adverse employment action, even in the absence of a demotion or pay decrease, so long as the particular circumstances present give rise to some level of objective intolerability.").

For example, in *Deleon*, a 53-year-old Hispanic employee of the Kalamazoo Road Commission was transferred to the Equipment and Facilities Manager position without any pay raise. *Id.* The position involved working in a garage facility filled with diesel exhaust fumes from

25

trucks. *Id.* He brought suit alleging violations of the Equal Protection Clause, Title VII, and the ADEA, alleging that he was targeted because of his race and age. *Id.* at 916. He testified that the reassignment to the new position "exposed [him] to toxic and hazardous diesel fumes on a daily basis," *id.* at 919, and that "his previous position never exposed him to the level of hazard presented by the new position," *id.* at 920. Other employees corroborated his testimony. *Id.* The court concluded that this testimony "presented sufficient disagreement" to preclude summary judgment: there was "evidence for the jury to consider that the new position was 'more arduous and dirtier.'" *Id.* (quoting *Burlington N.*, 548 U.S. at 71).

Given the evidence of isolation, vermin, and lack of resting areas, a reasonable jury could find that Gibbs' reassignment constituted an adverse employment action. Having found that Gibbs has raised a genuine issue of material fact as to whether at least one action was materially adverse for FMLA retaliation purposes, the Court will briefly address the other allegedly adverse conduct. Isolated comments are insufficient as adverse employment actions. The Court has found that the denial of training may constitute an adverse employment action due to Gibbs' three to four missed overtime opportunities. The mistaken termination by Ilardi did not ultimately have a material effect on Gibbs' employment status and it was quickly rectified; however, Gibbs did testify that she lost her insurance coverage and had to go without physical therapy as a result of the mix-up.

Lastly, it is impossible for the Court to evaluate on this record the propriety of requiring Gibbs to undergo a medical examination before she could return to work. Under FMLA regulations, Defendants were undoubtedly entitled to request a fitness-for-duty certification from Gibbs' own doctor before she returned to work. 29 CFR 825.312(a). But that is not what Defendants requested. Instead, they requested that Gibbs undergo a medical examination by a

company doctor. Thus, they were obliged to comply with "[r]equirements under the Americans with Disabilities Act." 29 CFR 825.312(h). Neither Gibbs nor Defendants have presented argument on whether the physical in fact complied with those regulations and the Court declines to search the record for itself to find the answer.

Gibbs' FMLA-retaliation claim will survive Defendants' summary judgment motion with the caveat that the "bitch" and "healing over 50" comments were not materially adverse employment actions for FMLA retaliation purposes.

### E.  "Count VI" – Intentional Infliction of Emotional Distress

In order to establish a claim for intentional infliction of emotional distress ("IIED") under Michigan law, Gibbs must demonstrate "(1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress." *Lewis v. LeGrow*, 670 N.W.2d 675, 689 (Mich. Ct. App. 2003) (citations omitted). "The test to determine whether a person's conduct was extreme and outrageous is whether recitation of the facts of the case to an average member of the community 'would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Id.* Put differently, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Lavack v. Owen's Worldwide Enter. Network, Inc.*, 409 F. Supp. 2d 848, 857 (E.D. Mich. 2005). This standard has been described as "formidable." *Atkinson v. Farley*, 431 N.W.2d 95, 97 (Mich. Ct. App. 1988). "In reviewing such a claim, it is initially for the court to determine whether the defendant's conduct reasonably may be regarded as so extreme and outrageous as to permit recovery." *Doe v. Mills*, 536 N.W.2d 824, 834 (Mich. Ct. App. 1995).

Gibbs asserts that Ilardi's treatment, particularly reassigning her to the Annex, "is, in itself, extreme and outrageous." (Pl.'s Resp. Br. at 22.) She also says that "Ilardi calling Gibbs a 'bitch' to her face when he cornered her in the ladies restroom is, in itself, extreme and outrageous." (*Id.*) The Court disagrees.

Although there are questions of material fact as to whether Gibbs' reassignment to the Annex constituted a materially adverse employment action for FMLA purposes, this action does not rise to the level of "extreme and outrageous conduct" for the purpose of an IIED claim. *See Loyd v. St. Joseph Mercy Oakland et al.*, No. 13-2335, slip op., at 14 (6th Cir. Sept. 10, 2014) ("As for Loyd's claim of intentional infliction of emotional distress, we need not wade into the preemption question because run-of-the-mill claims of employment discrimination (as are alleged here) do not constitute extreme and outrageous conduct sufficient to state a claim of intentional infliction of emotional distress under Michigan law."); *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 555 (6th Cir. 2002) (applying the Kentucky IIED standard, which maps the Michigan standard in applying the Restatement (2d) of Torts, and holding that "Ford may be able to establish that GM's conduct was intentional or reckless, but cannot claim credibly that an increased workload, heightened scrutiny, and constructive discharge was so outrageous and intolerable as to offend generally accepted standards of morality and decency."). To be sure, the Court has found that a reasonable jury could find that the Annex was dirty, pest-infested, and having to clean it was a punishment. But cleaning the Annex does not approach conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community," *Dalley v. Dykema Gossett*, 788 N.W.2d 679, 694 (Mich. 2010).

As to the "bitch" comment, "[a] defendant is not liable for mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Lewis*, 670 N.W.2d at 689 (internal quotation marks omitted). "Indeed, people are expected to endure 'a certain amount of rough language' and 'occasional acts that are definitely inconsiderate and unkind.'" *Melson v. Botas*, No. 315014, 2014 Mich. App. LEXIS 1144, at *3–4 (Mich. Ct. App. June 19, 2014) (citation omitted). Ilardi's comment, while crass and insensitive, does not amount to more than a mere insult. *Warren v. June's Mobile Home Vill. & Sales, Inc.*, 66 Mich. App. 386, 392 (Mich. Ct. App. 1976) ("It is not clear that an unfriendly attitude and name-calling constitute extremely outrageous conduct."). Even repeated incidents of foul language and name-calling in the workplace have been insufficient to state a claim for intentional infliction of emotional distress. *See, e.g.*, *McKee v. RAM Prods., Inc.*, No. 92-481, 1993 U.S. Dist. LEXIS 7346, at *1, 17 (W.D. Mich. Apr. 23, 1993) ("Mr. Chauncey allegedly used foul language on a regular basis with respect to both men and women, calling women 'bitches' and using 'F' words and references to body parts to describe men, including his boss. . . . Plaintiff's submissions fail to establish either extreme and outrageous conduct or severe emotional distress."). And that Gibbs testified that Ilardi "cornered" her before making the comment does not demand a different conclusion. *See id.* at 390 ("It has not been enough that the defendant has acted with an intent which is tortious or even criminal . . . .").

Defendants are entitled to summary judgment on the intentional infliction of emotional distress claim.

### F. "Count VII" – Assault and Battery

Gibbs alleges that Ilardi's act of throwing a mesh safety vest to her constituted an assault "and/or" battery. (Compl. at ¶ 30–32.) In order to succeed on a claim of assault, Gibbs must

demonstrate that Ilardi "(a) . . . act[ed] intending to cause a harmful or offensive contact . . . or an imminent apprehension of such a contact; and (b) [Gibbs was] thereby put in such imminent apprehension. *Russell v. Bronson Heating & Cooling*, 345 F. Supp. 2d 761, 796 (E.D. Mich. 2004) (citing *Mitchell v. Daly*, 350 N.W.2d 772 (1984)). In order to succeed on a claim of battery, Gibbs must demonstrate that "there was a willful and harmful touching of another person which results from an act intending to cause such contact." *Id.* (citing *Espinoza v. Thomas*, 472 N.W.2d 16 (1991)).

As to the assault claim, throwing a person a lightweight vest is simply not a "harmful or offensive contact." Gibbs herself admitted that the vest was about the weight of a t-shirt. (Gibbs Dep. at 14.) And it is not unusual for a person to toss an object to a waiting recipient. *Cf. Roasio v. Clark Cty. School Dist.*, No. 13-CV-362, 2013 WL 3679375 at *11 (D. Nev. July 3, 2013) (allowing an assault claim to proceed against a basketball coach who threw balls at the plaintiff's face during practice because while a "basketball player consents to normal physical contact during the course of a basketball game . . . players do not consent to their coaches throwing basketballs at their faces").

Moreover, the Restatement (2d) of Torts instructs:

If the other, though knowing of the act done by the actor and realizing that it is intended to cause him a bodily contact, believes, whether reasonably or unreasonably, that the means adopted by the actor are in and of themselves *incapable of effectively carrying out his purpose*, he has not been put in such an apprehension as is necessary to make the actor liable.

Restatement (Second) of Torts § 24 (cmt. a); *see Mitchell v. Daly*, 350 N.W.2d 772, 779 (1984) (adopting the Restatement definition of assault). Gibbs admitted that she was "surprised" rather than "afraid" when Ilardi prepared to throw her the vest. (Gibbs Dep. at 17.) Therefore, she cannot sustain her assault claim.

The same reasoning disposes of the battery claim, but, in addition, there is no evidence that the vest actually hit Gibbs. In her deposition, Gibbs merely testified that Ilardi threw the vest at her, not that the vest actually hit her. (Gibbs. Dep. at 14.) Without contact, there can be no battery. *See Stubblefield v. Hawkins Cty.*, No. 2:06-CV-129, 2007 WL 4365758, at *8 (E.D. Tenn. Dec. 11, 2007) ("'Assault and battery' is another of those legal terms that often has been thrown about too casually, as a result of which the meaning has become blurred. . . . A battery necessarily includes an assault, but an assault does not necessarily include a battery." (citation omitted)). Gibbs cannot sustain her battery claim on this record.

## V. CONCLUSION

Gibbs presented evidence that, upon her return from FMLA leave, she was assigned to work full time in an isolated, vermin-infested warehouse for an indefinite period rather than her usual route. She has argued that she was denied training and has connected this event to loss of overtime pay and direct and indirect evidence of age discrimination. Her ELCRA age-discrimination and FMLA-retaliation claims therefore survive. For the reasons stated at length above, Gibbs' ELCRA gender-discrimination, hostile-work-environment, and retaliation claims do not, nor do her state tort claims.

Defendants' motion is GRANTED IN PART and DENIED IN PART. The remaining counts in this case are Count I, insofar as it states a claim for age discrimination, and Count IV, FMLA retaliation.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Dated:  October 9, 2014

31

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on October 9, 2014.

s/Jane Johnson
Case Manager to
Honorable Laurie J. Michelson